IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH ROSS and CARLA ROSS,<br><br>Plaintiffs,<br><br>v.<br><br>THE KISKI SCHOOL and MARK P. OTT,<br><br>Defendants. | C.A. No. 2:25-cv-1996<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND JURY DEMAND**

**I. INTRODUCTION**

1. Plaintiffs Joseph Ross and Carla Ross ("Plaintiffs" or the "Rosses") bring this lawsuit under the Civil Rights Act of 1866, 42 U.S.C.A. § 1981 ("Section 1981") and the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. ("FHA"), against The Kiski School and Marc P. Ott ("Defendants") to redress racial discrimination and retaliation for opposing racial discrimination.

2. The Rosses are longstanding, loyal and well-regarded members of the Kiski community who worked for the school and supported its athletes and students for more than two decades. During that time, they were among a small group of African Americans who worked at Kiski and they and their home nurtured and helped many minority and other students navigate what were at times the challenging environment of an expensive and elite boarding prep school.

3. In summer 2024, Kiski's longtime Headmaster retired, and Mark P. Ott took over the position. Defendants then racially discriminated and retaliated against the Rosses by subjecting them to a hostile work environment, wrongfully discharging Joe Ross, evicting the Rosses from their longtime campus home in order to give it to a white teacher, and demoting and constructively discharging Carla Ross.

4. Defendants also did not renew the contracts of the other two black staff members.

5. In short, after Ott came, Kiski shed all of its black employees.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, since the events and occurrences that gave rise to Plaintiffs' claims occurred in this judicial District, and because Defendants are located within the Western District of Pennsylvania.

## III. PARTIES

8. Plaintiff Joseph Ross ("Joe Ross") is a black adult man who lives in Pennsylvania.

9. Plaintiff Carla Ross ("Carla Ross") is a black adult woman living in Pennsylvania.

10. Joe and Carla Ross are husband and wife.

11. Defendant The Kiski School ("Kiski" or the "School") is a prestigious, private boarding prep school located at 1888 Brett Lane, Saltsburg, PA 15681.

12. Defendant Dr. Marc P. Ott ("Ott") is Kiski's Headmaster and a Member of Kiski's Board. He resides on the Kiski campus in Saltsburg, PA.

## IV. FACTS

13. Prior to Kiski, Mr. Ross worked for over 20 years as Pennsylvania State Trooper.

14. Joe Ross started work for Kiski in 2003 and Mrs. Ross began in September 2005.

15. Joe Ross began as Kiski's Head Wrestling Coach and, over time, became Dorm Head, Assistant to the Headmaster, Head Baseball Coach, Assistant Football and Golf Coach, and Director of Security.

16. Over the years, Carla Ross has held a number of positions at Kiski. She has worked as Assistant Bookstore Associate, Dorm Parent, Assistant Librarian, FAME Liaison, Faculty Advisor for the HDC Committee and Residential Life Committee, Advisor to selected students and multiple clubs, including the Culture Pot Club, Kiski Cultivators, Bible Study, Literary Writing Club, and the Black History Club, among others, and in 2017, she was promoted to Director of Diversity, Equity, and Inclusion.

17. The Rosses were loyal, industrious, esteemed members of the Kiski community.

18. Kiski's previous Headmaster, Chris Brueningsen, retired in Summer 2024

19. Ott took over as Headmaster effective July 1, 2024.

20. When Ott took over, Kiski had four (4) black employees: the Rosses, John Shelton, and Kenneth-Anthony Clarke; over the next year and change, Ott ended the employment of three of them and sought to terminate and successfully demoted, the fourth.

21. Ott was hostile to Kiski's black employees, as quickly became apparent:

   a. In July 2024, Joe Ross spotted Ott moving boxes into Ott's campus residence and offered to help; Ott refused his assistance;

   b. In August 2024, Ott wrote-up Joe Ross for actions taken by an alumnus, David Conrad, while Joe Ross was in Harrisburg, PA;

   c. Although Joe Ross was Director of Security, Ott excluded him from security meetings—despite his requests to be included and though he had substantial security experience from a long career as a PA State Trooper. Instead, Ott held security meetings with white managers with less (or no) security experience;

   d. Ott refused to engage with Carla Ross about her work as a Director or as Advisor to the Culture Pot Club, a significant leadership and community engagement program, despite her request for a formal meeting and though Ott met regularly with white director-level employees;

   e. If Ott saw Joe Ross or other black male staff, he tried to avoid them; and

    f.  Ott initially denied an interview, and refused to consider or promote, a black staff member to a position he had already been performing for months—despite the objections of Carla Ross, a member of the faculty hiring committee—and, instead, hired a much younger (33-year-old) non-African American.

22. Others in the Kiski community also noted Ott's hostility toward blacks.

23. Around December 9, 2024, Ott called Joe Ross to his office about an athletic matter. Though Joe Ross did nothing wrong, Ott demeaned him in front of others and spoke to him as if he lacked integrity. Joe Ross objected to Ott's mistreatment and asked to be excused.

24. The same day, Joe Ross alerted Kiski Board member Mike Hoag that Ott was out to get him (Joe Ross). Hoag, however, assured Joe Ross that he was a valued member of the Kiski community and that his position was secure.

25. On or about December 10, 2024, Ott approached Joe Ross—a cancer survivor—as he was sitting in his car after a medical appointment waiting for his wife. Joe Ross indicated he was not feeling well and told Ott it'd be better to speak later. Ott, however, kept pressing until Joe Ross exited his car.

26. When Carla Ross arrived, she reiterated that her husband was not feeling well. She also raised the issue of Ott's mistreatment, stating that she and her husband were people of integrity and that it was not in the best interest of Kiski students from marginalized backgrounds for Ott to get rid of all the "men" (i.e., Black men), which it seemed to her Ott was doing.

27. A day or two later, the Rosses were called to meet with Ott and Associate Head of School Pete Bonds. At the end of the meeting, Ott presented them with a write-up that falsely accused them of accosting Ott and asked them to sign it; neither did.

28. In February 2025, Carla Ross—who has served as Director of the International Food Festival for the past 10 years, personally invited Ott and his wife to this annual event. After

4

an assembly, she approached Ott to express her hope that they would attend, emphasizing that it is among the most unifying and celebrated campus events. Ott refused to make eye contact, spoke over Carla Ross to another employee, and responded dismissively: "I'll have to see, I don't know." He walked away without further acknowledgment and did not attend the festival.

29. In spring 2025, Kiski offered contracts for the 2025-2026 school year to nearly all existing employees, including offering contracts to Joe and Carla Ross, which they accepted.

30. Only three employees were not offered 2025-2026 contracts by Kiski; of the three employees, two were African American.

31. Kiski held its annual alumni reunion weekend on May 30–June 1, 2025.

32. Joe Ross has developed close relationships with many alumni and his absence from the reunion would have raised questions among them.

33. Ott waited until the reunion was over before he terminated Joe Ross without cause or warning on June 4, 2025.

34. Kiski later claimed the Joe Ross's termination was based on an alleged exchange with the Director of Maintenance, who is white, in mid-April 2025—yet in the seven weeks between then and discharge, Defendants never bothered to interview Joe Ross about it.

35. Defendants later replaced Joe Ross with an all-white security team, including additional white security guards. (By contrast, Defendants repeatedly denied Joe Ross's requests for additional security assistance.)

36. Around mid-June, a Kiski parent wrote to the Board, describing Joe Ross's valuable contributions to Kiski's students and community, and asking the Board to reconsider his termination.

37. After the term ended, the Rosses left campus to visit family. Ott waited until the Rosses were traveling to email Carla Ross that Kiski had "rescinded" her 2025–2026 contract, citing the termination provision in her contract.

38. In the email, Kiski purported to offer Carla Ross a new contract—for a year she'd already worked (2024), in a lesser position, and with no on-campus housing—and directed her to confirm receipt *that same day*—though Kiski knew she was traveling—and Kiski normally gives employees more than a month to review any new contract.

39. When Carla Ross did not immediately confirm receipt (as she had yet to see the email), Kiski seized on her lack of response as a flimsy excuse to claim that she had "resigned."

40. Kiski administrators had no reason to believe that Carla Ross—the school's last remaining black employee—had resigned.

41. Carla Ross never said she was resigning; she never handed in a resignation; she never turned in her office or dorm keys; she never removed personal items from her campus office; and she still was living and kept her belongings in her on-campus home. The only thing she did was return Joe Ross's belongings, as Kiski instructed, which were plainly his, and which she identified as his on return.

42. Once Carla Ross saw Ott's emails, she swiftly responded, objecting to her "termination," and reminding Ott that all items returned belonged to her husband.

43. Shortly after Carla Ross responded, Kiski shut off her email access.

44. Despite Carla Ross's objection to her "termination," Kiski said nothing—and for more than three days did not deny that Kiski intended to terminate her—until the Ross's attorney notified Kiski's counsel that the Rosses had retained counsel.

6

45.     Kiski then backtracked and claimed that it had not terminated Carla Ross; Kiski, however, still demanded that the Rosses vacate their long-time home on campus.

46.     Kiski should have permitted the Rosses to remain in the spacious four bedroom, two bath, campus home that the Rosses had substantially improved (installed marble floors, chandeliers etc.) and had lived in for more than 20 years.

47.     Carla Ross's employment contracts with Kiski for years promised on campus housing, and Kiski permitted numerous white couples to live in campus housing even though only one spouse was employed by Kiski.

48.     Despite repeated requests, Kiski refused to allow the Rosses to remain in their campus housing and, instead, gave it to a white teacher.

49.     The Rosses, through counsel, wrote to Kiski attorneys, opposing this disparate treatment as discriminatory and as retaliation for engaging in protected activity.

50.     On July 16, 2025, in disregard of the Rosses' federal rights, Kiski posted a public legal notice on the front door of their long-time campus home, threatening eviction if they did not vacate by July 31, 2025.

51.     On July 17, 2025, Kiski, through counsel, sent Carla Ross a contract offering her a lesser position (Assistant Librarian not the Director-level position in her original 2025–2026 contract) and no on-campus housing (unlike her original 2025-2026 contract).

52.     Though Kiski employees are normally given more than a month to consider any new contract, the July 17, 2025 letter from Kiski's counsel advised Carla Ross that she must sign the new contract by July 21, 2025 or Kiski would consider her employment "ended."

53.     After demotion to Assistant Librarian, Kiski and Ott also stripped Carla Ross of her duties as Advisor to six students, without explanation to her or the students; removed her as

7

"Head" of a student lunch and dinner table; took her off the demerit council (HDC), off the faculty and staff hiring committee; off the DEI committee; and off the International Food Festival.

54. After demotion, Carla Ross no longer had a budget to support the student Clubs she sponsored and could no longer stay late or on weekends for Club meetings since she no longer lived on campus and was much further away.

55. As a result of eviction, Carla Ross had to travel long distances to and from work, bear additional expenses, and live apart from her husband.

56. On December 1, 2025, Carla Ross gave notice of her separation from Kiski effective December 31, 2025.

57. Under these circumstances, her separation was a constructive discharge.

58. Carla. and Joe Ross have suffered grief, humiliation, mental anguish, and other severe emotional distress; damage to dignity and professional reputation; discharge (Joe Ross); demotion/ reduction in duties/constructive discharge (Carla. Ross); loss of community; loss of benefits and other emoluments of employment contract; and loss of home, housing and related consequential damages, due to Defendants' race discrimination and retaliation in violation of federal law.

## V. ADMINISTRATIVE EXHAUSTION

59. Joe and Carla Ross filed EEOC charges (dual-filed with the PHRC) on July 28, 2025 and October 3, 2025, respectively, asserting race and age discrimination and retaliation.[1]

---

[1] Plaintiffs will seek leave to amend to add additional claims this action once these charges are administratively exhausted.

**COUNT I**

<u>**VIOLATION OF CIVIL RIGHTS ACT OF 1866, 42 USC § 1981**</u>

*(Racial Discrimination – Kiski and Ott)*

60. The foregoing paragraphs are incorporated by reference.

61. Section 1981 gives employees the right to be free from discrimination on the basis of race, including in employment contracts and in the terms and conditions of employment.

62. Defendants discriminated against the Rosses based on a protected trait (race) in violation of Section 1981.

63. Defendants engaged in a course of racially discriminatory conduct against Kiski's black employees—including preferential treatment of white employees; baseless discipline and wrongful discharge of Joe Ross; eviction of the Rosses from their longtime campus home; and wrongful demotion, reduction of duties and constructive discharge of Carla Ross—with the result that Kiski no longer has any Black employees.

64. By virtue of his conduct and his supervisory role, Ott personally participated in, and aided and abetted, the discrimination against the Rosses.

65. Defendants' conduct was outrageous, offensive, intentional, and discriminatory toward the Rosses; and it was performed with malicious, reckless indifference, and/or wanton disregard of the Rosses' federal civil rights.

66. As a result of Defendants' unlawful conduct, Joe Ross has lost wages, and the Rosses have lost benefits and other emoluments of employment; lost their long time campus housing, which they significantly improved over the two decades they lived there; suffered mental anguish and severe emotional distress, reputational harm, damage to dignity, and humiliation; borne additional out-of-pocket expenses; and incurred attorneys' fees and costs.

## COUNT II

### **VIOLATION OF 42 U.S.C.A. § 1981 ("Section 1981")**
(*Retaliation – Kiski and Ott*)

67.    The foregoing paragraphs are incorporated by reference.

68.    Section 1981 gives employees the right to be free from retaliation for opposing racial discrimination in employment contracts and in the terms and conditions of employment.

69.    Reporting and complaining about discriminatory conduct to an employer and subsequently filing an EEOC charge alleging race-based discrimination and retaliation, are protected activity under Section 1981.

70.    The Rosses engaged in protected activity, including opposing Ott's racially discriminatory treatment, reporting discrimination, and filing an EEOC charge.

71.    Defendants retaliated against the Rosses for engaging in protected activity through baseless discipline, by firing Joe Ross based on false claims, following the Rosses around campus surveilling them, attempting to terminate and then demoting and constructively discharging Carla Ross, and evicting the Rosses from their long-term home.

72.    Defendants' retaliatory conduct would dissuade a reasonable employee from complaining about unlawful conduct or otherwise engaging in protected conduct under Section 1981.

73.    Defendants' conduct was outrageous, offensive, intentional, and discriminatory toward the Rosses; and was performed with malicious, reckless indifference, and/or wanton disregard of the Rosses' civil rights.

74.    As a result of Kiski and Ott's unlawful conduct, the Rosses have lost their positions, home, and community; suffered economic damages, mental anguish, and severe

emotional distress, damage to dignity; reputational harm, and humiliation; and incurred attorneys' fees and costs.

## COUNT III

### VIOLATION OF FAIR HOUSING ACT, 42 U.S.C. § 3601 et seq
*(Race Discrimination/Interference - Kiski and Ott)*

75. The foregoing paragraphs are incorporated by reference.

76. Under the FHA, it is unlawful to refuse to sell or rent, or otherwise make unavailable or deny, a dwelling to any person, or to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, because of race.

77. Under the FHA, it is also unlawful to coerce, intimidate, threaten, or interfere with any person in his or her enjoyment of any rights granted or protected by the FHA.

78. Defendant Kiski provides on-campus housing to many of its faculty and staff.

79. Defendant Kiski provides on-campus housing to multiple white couples where only one member of the couple is employed by the School.

80. For years, Defendant Kiski separately promised Joe Ross and Carla Ross housing as part of their annual compensation contracts.

81. For over 20 years, Joe and Carla Ross lived in an on-campus residence provided by the School, which they substantially improved, raised their family in, into which they invited and counselled many Kiski students, especially minority students, trying to navigate the many challenges presented by life in an elite boarding prep school, and which held many cherished memories for them and from which they were summarily and very publicly evicted like some delinquent tenant or miscreant.

82. In July 2025, Defendants rescinded Kiski's offer of on-campus housing to Carla Ross for the 2025-2026 school year—thereby forcing its last African American employee and her spouse off campus.

83. When the Rosses protested these discriminatory and retaliatory actions and asserted their right to remain, Defendants publicly posted an eviction notice on their front door where all campus passers-by could see it.

84. The Rosses were forced to pack up and move a 20-year home in less than two weeks and had to discard many of their belongings as a result.

85. Defendants' actions deprived the Rosses of rights in violation of the FHA.

86. Defendants' conduct was outrageous, offensive, intentional, and discriminatory toward the Rosses; and was performed with malicious, reckless indifference, and/or wanton disregard of the Rosses' civil rights.

87. As a direct and proximate result of Defendants' actions, the Rosses have suffered, and continue to suffer, economic and non-economic damages, including moving expenses, travel expenses, loss of property, damage to reputation and dignity, mental anguish, pain, suffering, inconvenience, embarrassment, and humiliation.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, the Rosses respectfully requests that the Court assume jurisdiction of this case, find in their favor on all Counts, enter judgment on their behalf, and:

    a. Find and declare that Defendants are liable for racial discrimination and retaliation against the Rosses in violation of Section 1981 and the FHA;

    b. Enjoin Defendants to end their illegal practices denying employment and housing based on race;

    c. Award the Rosses back and front pay, lost benefits and emoluments of employment;

    d.      Award the Rosses compensatory damages against all Defendants for mental anguish, suffering, humiliation, other emotional distress, loss of dignity, and harm to reputation;

    e.      Award the Rosses punitive damages for violations of Section 1981 and the FHA;

    f.      Award the Rosses reasonable attorneys' fees, costs, and expenses of the action;

    g.      Award the Rosses pre- and post-judgment interest as provided by law;

    h.      Award the Rosses any other relief necessary to make them whole; and

    i.      Award the Rosses any other relief that the Court considers proper.

## VII. **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable in the above-captioned action.

Respectfully submitted,

Dated: December 22, 2025

/s/John Stember
John Stember, Esquire
PA ID No. 23643
jstember@stembercohn.com
Maureen Davidson-Welling, Esquire
PA ID No. 206751
mdw@stembercohn.com
Jonathan K. Cohn, Esquire
PA ID No. 92755
jcohn@stembercohn.com
**STEMBER COHN &**
    **DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445
F.: (412) 338-1446

*Attorneys for Plaintiffs*